In the Matter of the Application of GLORIA MORGAN VANDERBILT, Appellant, for a Writ of Habeas Corpus to Bring up the Body of GLORIA LAURA MORGAN VANDERBILT, an Infant.

GERTRUDE VANDERBILT WHITNEY, Respondent, and GEORGE W. WICKERSHAM and THOMAS B. GILCHRIST as General Guardians of the Property of GLORIA LAURA MORGAN VANDERBILT, an Infant, Added Parties.*

First Department, July 3, 1935.

* Record sealed by order of the court.— [REP.

*Nathan Burkan* of counsel [*Louis D. Frohlich, Herman Finkelstein* and *James A. Murray* with him on the brief], for the appellant.

*Joseph M. Proskauer* of counsel [*Frank L. Crocker* and *Theodore J. Miller* with him on the brief; *Frank L. Crocker* and *Dunnington & Gregg*, attorneys], for the respondent.

*Henry W. Taft* of counsel [*Cadwalader, Wickersham & Taft*, attorneys], for George W. Wickersham and Thomas B. Gilchrist, as general guardians of the property of Gloria Laura Morgan Vanderbilt, appearing specially.

UNTERMYER, J.   This proceeding, instituted by writ of habeas corpus in September, 1934, is concerned with the custody of Gloria Vanderbilt, an infant then ten years of age.   Her mother, the petitioner, about thirty years of age at the time of this proceeding, was born in Switzerland of American parents.   The greater part of her early life was spent abroad and there were formed most of her associations.   Probably for these reasons she entertained a distinct preference for life abroad — a preference which we would have no thought to criticise had it not been permitted at times to interfere with the welfare of the child.

At the time of the institution of these proceedings, the child, for upwards of two years, had been residing with her aunt, Mrs. Whitney, the respondent in this proceeding, in whose care she had been placed by the petitioner in June, 1932.   The court at Special Term has found upon sufficient evidence that " the life led by this infant from the death of her father until June, 1932, was entirely unsuitable, unfit, improper, calculated to destroy her health and neglectful of her moral, spiritual and mental education."   It found that her life with Mrs. Whitney since June, 1932, " has been fit, suitable and appropriate " and has tended to promote her welfare and happiness. Accordingly, the court awarded the custody to Mrs. Whitney, but granted to the mother the right to have the child with her from each Saturday morning until Sunday night, on Christmas, and during the entire month of July in each year.   That, of course, is not to be taken as a justification for bringing this child hereafter into any environment that is improper or unsuitable.

In determining the question of custody the court did not sustain
certain allegations made against the petitioner, which, it was claimed,
rendered her unfit to be the custodian of the child, but although
it did not sustain these allegations, it declined to make any deter-
mination either in her favor or against her with respect to them.
We think that the charge which rests upon the testimony of the
maid Caillot, elicited on cross-examination, is so detrimental to
the petitioner and the evidence to support it so unsubstantial that
she was entitled to unqualified and complete exoneration.

Conceding this, more than enough remains to justify the action
of the court below in awarding custody to the aunt in preference
to the mother. We recognize, of course, that nothing short of
most unusual circumstances should warrant the refusal of custody
to a parent in favor of any other relative no matter how unselfish her
motives may be. But in our opinion the record here discloses such
persistent indifference on the part of the petitioner towards the child,
such long-continued neglect of her general welfare, that her happi-
ness, if not her health, offers no alternative. That neglect and
indifference began to manifest itself soon after the death of the
petitioner's husband in 1925. In spite of admonition, it became
much intensified by 1929, after which, until the institution of these
proceedings, the petitioner appears to have given little thought and
even less attention to the child. During the greater part of five
successive years she separated herself, physically and spiritually,
from the child, leaving her sometimes in the care of relatives, some-
times in the care of a nurse alone, apparently inquiring only rarely,
and then perfunctorily, concerning her welfare.

Soon after the death of her husband in September, 1925, the
petitioner took the child abroad, where they remained until March,
1932. During this period the petitioner led a rather nomadic life,
dividing her time principally between Paris, London, the Riviera
and New York. Omitting reference to shorter separations, the
petitioner appears not to have seen the child at all during the summer
of 1929 when the child was at Biarritz, France. During the summer
of 1930 the child was at Evian, France, while her mother was at
Cannes. She visited the child only on one occasion for a single
day. For the summer of 1931 the child was sent to Glion, Switzer-
land. The petitioner went to Cannes on the Riviera and did not
see the child at all. During the winter of 1931–1932, the child
was at Melton-Mowbray, England, about five hours by rail from
London, where the mother was residing. She appears to have
visited the child only on a few occasions. During all this
time, even when not separated, the petitioner generally saw her child
only for a few moments at a time, as the trial court, upon the evi-
dence, had the right to find.

In March, 1932, at the insistence of the surrogate who controlled the allowance made to the petitioner for her child's support, she returned to this country with the child, intending to resume residence here. At this time the child, who had always been of delicate health, had developed a sinus and tonsil condition for which physicians advised an operation early in the month of June. In spite of this, the petitioner suddenly returned to Europe on April twenty-ninth, leaving the child at a hotel in this city with its nurse. She attempted to justify her departure by the statement in a letter to one of the guardians of the infant's property, written on the day of her departure, that " the doctor tells me that Gloria cannot have her operation until late in July." The statement was shown to be untrue. A letter written to the petitioner on May ninth, by one of the child's guardians, also pointed out the danger of delay. The letter was ignored. We think the petitioner could not fail to know that delay in the operation would have been highly undesirable, but was willing to subordinate the health of the child to her own inordinate desire for life abroad. Finally, on May twenty-third, the condition of the child continuing serious, the petitioner was summoned by cable from abroad to be present at the operation, which was performed on June eighth. She again returned to Europe on June twenty-fourth, while the child was still at the hotel under medical supervision and, though out of bed, was not yet able to be out of doors. Before leaving, the petitioner consented that, as soon as the child was able to be moved, Mrs. Whitney should take her to Westbury, L. I., where she has resided, with a few brief interruptions, ever since. The entire summer of 1932, a part of the winter of 1932–1933, the summer of 1933 and the winter of 1933–1934 were spent by the petitioner in Europe and, for a short time, in California. During that interval of more than two years she visited the child on very few occasions. The child visited the petitioner's home in New York, from June, 1932, until September, 1934, only twice.

The reasons which the petitioner offers in explanation of her conduct seem to us entirely unconvincing and inadequate. Not until the allowance, which was provided for the child's support, appeared to be endangered by the fact that the child no longer lived with her, does the petitioner appear to have manifested any strong desire for her daughter's companionship.

These long periods of separation, coupled with the petitioner's indifference to the welfare of the child and her unwillingness to devote any substantial amount of time to cultivating her affection, have had consequences which might have been anticipated. The child is now hostile to the mother and devoted to those who for upwards of two years have fostered and protected her. An attempt

by the petitioner to resume even temporary custody caused the child to become so hysterical that physicians had advised against the change. To no avail did the trial judge suggest that she return to the petitioner. She steadfastly refused to be persuaded and insisted on remaining with her aunt. A child who had received ordinary consideration from a parent would not be likely to feel this way. Although it does not appear exactly when this child first became estranged from her mother, it does appear that it was a considerable time before she came to live with Mrs. Whitney.

It is difficult to see how, under these circumstances, the court below could have made any different disposition than it did. It could hardly have directed that, against her vehement protest, this child should be taken from the wholesome life which she is now leading among people to whom she has become attached, and consigned to the life of neglect and loneliness which had alienated her affection. The court adopted what appears to us the only possible course. It directed that the child remain in the custody of the respondent, to whom the petitioner herself had willingly intrusted her in 1932, that she continue to reside where she now resides and attend the school which she now attends, spending each weekend and a month during the summer with the petitioner, so that the petitioner may have the opportunity to win her affection and confidence. As to this the court below said: " I think the mother should have such access to the child as will not interfere with the present life of the child but will give her an opportunity to win the child back and to take care of her properly in the future. This child will not for the future have the life that it had from the death of its father until June, 1932. It must have a life equivalent to that which it is now receiving. * * * I think she [the mother] ought to be allowed to try and win this child back and try to give it the life that I have indicated she ought to have. She cannot do that right away. The child would not go to her." We think this was an eminently just solution of a problem which is one more of human relations than of law. If, in the course of time, this child desires to return to the petitioner and the court is satisfied of the sincerity of her intention to maintain a home where the child can have a normal life, the way is open for the reconsideration of the question of custody. In the meantime, if the petitioner shall avail herself fully of her rights under the order, she will spend more time with her child than for many years past.

The orders should be affirmed.

MARTIN, P. J., MERRELL, McAVOY and O'MALLEY, JJ., concur.

Orders affirmed.